## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Spectro Alloys Corporation,

        Plaintiff and
        Counter-Defendant,

  v.

Fire Brick Engineers Co., Inc.,

        Defendant and
        Counter-Claimant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-312 ADM/FLN

_____

Jonathan M. Bye, Esq., Kelly G. Laudon, Esq., Meghan M. Elliot, Esq., Daniel James Schwartz, Esq., and Karla M. Vehrs, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, on behalf of Plaintiff.

Joseph M. Windler, Esq., Thomas H. Boyd, Esq., and Matthew C. Robinson, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On May 28, 2014, and again on August 26, 2014, the undersigned United States District Judge heard oral argument on Plaintiff Spectro Alloys Corporation's ("Spectro") and Defendant Fire Brick Engineers Co., Inc.'s ("FBE") cross-motions for summary judgment [Docket Nos. 59, 76].  For the reasons set forth below, FBE's motion for summary judgment is granted in part and denied in part.  Spectro's motion for summary judgment is denied.

## II.  BACKGROUND

Spectro operates an aluminum smelting facility in Rosemount, Minnesota.  The smelting plant includes two large furnaces, referred to as Furnace No. 1 and Furnace No. 3.  The Furnaces melt scrap aluminum which is then processed into aluminum ingots which in turn are sold to aluminum manufacturers around the world.  The Furnaces are freestanding steel structures lined

with refractory materials.  Refractory is a chemical and heat resistant material designed to withstand the corrosive, high temperature environment inside industrial furnaces.  The refractory materials are necessary to contain the heat and the molten metal inside the Furnaces.  Refractory materials are consumable and eventually need to be repaired or replaced, even under ideal operating conditions.  <u>See</u> Joseph Windler Decl. [Docket No.  63] Exs. C, H, and P; <u>see also</u> Kelly Laudon Decl. [Docket No. 67] Exs. 47, 49.

FBE began providing refractory installation and repair services for Spectro in 2000.  This lawsuit arises from three contracts for three projects—(1) an early 2010 contract to provide a replacement refractory lining in Furnace No. 3; (2) a late 2010 contract to provide patching to the refractory in Furnace No. 1; and (3) a 2012 contract to provide replacement refractory in Furnace No. 3.  In the decade before this dispute, Spectro served as general contractor and provided all direction and supervision for the installation of the refractory lining in its furnaces.  In these contracts, FBE's proposals did not include Spectro's role in the installation.  <u>Compare</u> Laudon Decl. Ex. 6 <u>with</u> Ex. 9.  The contracts include standard terms and conditions (T&Cs).  Michael Skatter Decl. [Docket No. 62] Exs. A, E, and H.  Paragraph 8 of the T&Cs warrants the competency of FBE's workmanship:

> We guarantee that all work will be done in a competent manner and will be free from defects.  We guarantee that all materials manufactured by Fire Brick Construction Division of Fire Brick Engineers Company will be free from defects and suitable for installation.

<u>Id.</u>  The warranty continues:

> It will be the responsibility of the purchaser to notify Fire Brick Construction Division of Fire Brick Engineers Company of any defects in workmanship or materials within six months after completion of the installation or the material purchase.  Fire Brick Construction Division of Fire Brick Engineers Company will provide materials and/or labor to correct any deficiency.  All corrections will be

> made on a prorated basis during a regular work week, at a time mutually agreeable to Fire Brick Construction Division of Fire Brick Engineers Company and the purchaser.  Equipment and/or materials purchased by Fire Brick Construction Division of Fire Brick Engineers Company for this installation will carry the warranty extended to us by the manufacturer.

Id.  Finally, the contracts specified what is not included under the warranty:

> NOT INCLUDED UNDER WARRANTY - Normal wear and tear of materials and/or equipment, damage resulting from improper bake-out on the lining, damage resulting from explosions or abnormal service conditions, materials and/or equipment not manufactured by Fire Brick Construction Division of Fire Brick Engineers Company, damage resulting from failure of the rods, buckstays or other retaining devices not installed by Fire Brick Construction Division of Fire Brick Engineers Company OR ANY OTHER CONSEQUENTIAL DAMAGES.

Id.  For all three projects, FBE purchased refractory material on Spectro's behalf, and then FBE mixed the materials on-site, applied the refractory material to the inside of the furnace, and "vibrated" and heated the refractory material to set up and test its strength.

**A.  Furnace No. 3**

In 2010, Spectro's Furnace No. 3 experienced a failure when aluminum leaked from the furnace.  In replacing Furnace No. 3, Spectro decided to increase its capacity for liquid metal from 230,000 lbs. to 300,000 lbs.  HavTek Structural Consulting, Ltd. was hired to design, and O'Reilly Fabrication and Welding to construct the new Furnace No. 3.  Windler Decl. Ex. C 95:21-96:24; 116:11-117:22.  Spectro claims it relied on FBE to choose the refractory materials, and to design and install the refractory lining.  FBE claims it did not provide any design or manufacturing services to Spectro, only installation services.  It is undisputed that FBE purchased its pre-installation material from Xertech Specialties, LLC ("Xertech").  Id. at 98:16-18, 137:23-25; Skatter Decl. Exs. A, B.  FBE characterizes this purchase as "on behalf of Spectro" and claims Spectro unequivocally made the decision to use Xertech refractory

materials.  Spectro claims that it relied on FBE to choose appropriate materials for the installation.  The installation of the new furnace lining was completed in July 2010.

In the Fall of 2010, Spectro claims it observed the east side of the Furnace's hot wall moving.  Laudon Decl. Ex. 46 39:12-21.  Spectro notified FBE, and FBE inspected the furnace the first week of January 2011.  Id. Ex. 47 226:24-228:14.  FBE investigated the problem, turning at times to the material manufacturer, Xertech, and its distributor for their input.  Id. Exs. 16-17.  Spectro shut down the furnace for a week in March 2011, to allow FBE to make repairs.  Id. Ex. 17; Ex. 47 236:7-21.  Spectro claims that the work performed in 2011 did not correct the problems and in January 2012, Spectro requested FBE return to inspect and repair the furnace.  Id. Ex. 46 137:1-18; Ex. 47 241:12-242:5; Ex. 18.

Between March and May 2012, FBE and Spectro discussed how to make Furnace No. 3 operational.  Id.; see also Exs. 19, 20, 64.  In May 2012, Spectro hired FBE to tear out the Xertech refractory material that FBE had mixed and installed.  The parties dispute who made the decision to use alternative refractory raw materials manufactured by Allied Mineral Products ("Allied").  Prior to installation, on July 27, 2012, FBE invoiced Spectro $315,000 for the pre-purchase of some of the required Allied refractory.  On September 19, 2012, FBE provided Spectro with a written proposal, totaling $940,650, to perform the repairs on Furnace No. 3.  On September 27, 2012, FBE's proposal was signed by Spectro.  Id. Exs. 22-23; 65.

FBE installed the Allied manufactured refractory materials in Furnace No. 3.  On October 31, 2012, FBE issued an additional invoice to Spectro for $629,723.  Skatter Decl. Ex. I.  This represented the balance due for the labor and materials and, when added to the earlier invoice for $315,000, totals $944,723.  Spectro has refused to pay this amount alleging that FBE's original

4

installation caused the 2010 lining to fail prematurely and the expense of the repair should be offset against the warranty. Laudon Decl. Ex. 25; Ex. 46 200:2-200:23; Ex. 47 267:6-268:23. Spectro also claims FBE's installation of the 2012 Allied refractory materials did not go smoothly and the lining began failing immediately. In early December 2012, Spectro claims it observed the 2012 lining was cracking and separating, and requested all repairs be performed at no cost pursuant to the warranty provisions of the 2012 contract. Id. Ex. 47 269:18-25, 274:9-25; Ex. 27. At this point, Spectro claims FBE refused to honor the 2010 or 2012 warranty and therefore Spectro refused to pay for the balance of the 2012 contract. Spectro chose to hire third parties to do the warranty repair work.

**B. Furnace No. 1 in 2010**

In September 2010, Spectro hired FBE to perform repair work on Furnace No. 1's lining, including the replacement of one of the hot walls. The refractory material used to repair the lining was manufactured by Xertech, but FBE mixed and set it on-site. Spectro used Furnace No. 1 from October 2010 to January 2013, at which time it took Furnace No. 1 "offline" for business reasons. Windler Decl. Ex. C 249:20-250:12.

**C. The Present Action**

In December 2012, Spectro, FBE, and Xertech conferred about the 2010 and 2012 linings for Furnace No. 3 and the 2010 lining of Furnace No. 1. In a follow-up email, FBE denied that either the 2012 lining work on Furnace No. 3 or any work being requested on the 2010 lining of Furnace No. 1 should be considered warranty work.

Spectro filed the present action on February 6, 2013. Spectro claims that test results on the refractory material demonstrates that FBE's 2010 installation was responsible for the

premature failure of both Furnace No. 1 and Furnace No. 3.  Spectro alleges claims for breach of

purchase orders (Counts 1, 5, 9), breach of express warranty (Counts 2, 6, 10), breach of implied

warranty of fitness (Counts 3, 7, 11), and breach of implied warranty of merchantability (Counts

4, 8, 12).  See Am. Compl. [Docket No. 28].  Spectro seeks damages for the replacement costs of

Furnace No. 1 and No. 3, incurred in 2013, and the value of the lost production during the repairs

and replacement.  In addition, Spectro claims it is not liable for the $945,000 cost of the 2012

Furnace No. 3 lining contract because it was covered by its warranty.

FBE moves for summary judgment on all of Spectro's claims.  FBE counterclaims,

alleging breach of contract (Count 1), unjust enrichment (Count 2), promissory estoppel (Count

3), and quantum meruit (Count 6).  See Countercl. [Docket No. 8].  Spectro moves for summary

judgment on FBE's unjust enrichment, promissory estoppel, and quantum meruit claims.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the

evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465,

470 (8th Cir. 1995).  However, the nonmoving party may not "rest on mere allegations or

denials, but must demonstrate on the record the existence of specific facts which create a genuine

issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving

party has been presented, summary judgment is inappropriate.  Id.  However, "the mere

existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

**B.  Uniform Commercial Code and Hybrid Contracts**

As adopted by Minnesota Statutes Sections 336.2-313 to 336.2-315, the Uniform Commercial Code's ("UCC") warranty provisions, like all provisions taken from Article 2 of the UCC, "apply only to the sale of goods, not the sale of services."  Russo v. NCS Pearson, Inc., 462 F. Supp. 2d 981, 997 (D. Minn. 2006); see also LeSeur Creamery, Inc. v. Haskon, Inc., 660 F.2d 342, 346 (8th Cir. 1981).  "When a contract arguably covers both goods and services, 'Minnesota courts use the predominant purpose test to determine whether the UCC applies to such a contract or transaction.'"  Denson Int'l Ltd. v. Liberty Diversified Int'l, Inc., No. 12-3109, 2014 U.S. Dist. LEXIS 93075, *12 (D. Minn. July 9, 2014) (quoting AKA Distrib. Co. v. Whirlpool Corp., 137 F.3d 1083, 1086 (8th Cir. 1998)).  This test weighs whether the purpose of the contract is primarily the rendition of service, with goods incidentally involved (e.g., contract with an artist for a painting) or is a transaction for a sale of goods, with labor incidentally involved (e.g., installation of a water heater in a bathroom).  AKA Distr. Co., 137 F.3d at 1085 (citing Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974)) (quotations omitted).  The Courts consider several factors in determining a contract's predominant purpose, including, (1) the language of the contracts, (2) the relative value of the goods and services, and (3) the business of the seller.  See Donatelle Plastics Inc. v. Stonhard, Inc., No. 01-1429, 2002 U.S. Dist. LEXIS 17122, *42-43 (D. Minn. 2002).

The predominant purpose of FBE's contracts with Spectro was the provision of services.

The contracts specifically state FBE does not warranty materials manufactured by third-parties. Skatter Decl. Exs. A 4 ¶ 8, H 5 ¶ 8.  FBE does sell refractory raw materials, but Spectro did not purchase FBE's refractory raw materials.  Instead, FBE mixed and applied Xertech and then Allied manufactured materials.  Even if FBE recommended these third-party refractory materials be used by Spectro, the explicit language of the contract disclaims warranty of these third-party manufactured materials.  In addition, the proposals for the 2010 Furnace No. 1 repairs and the 2012 Furnace No. 3 repairs demonstrate the significant amount and skilled nature of the labor required in refractory lining work.  Id. Exs. E, H.  FBE proposed to mobilize a work crew, remove refractory lining that was not performing, "hand scale" a wall of Furnace No. 1 in 2010, build and install forms for Furnace No. 3, mix the refractory material to a certain composition and consistency, pour the material, set it, "vibration cast" it, and pull the forms when the materials set up.  Although the 2010 relining of Furnace No. 3 proposal only enumerates the raw materials brought to the work site, charging for labor and other materials later, similar service work was performed for all three contracts.  This service work was not incidental; rather, it is more akin to a painter who mixes his paint colors and applies them to a canvas than it is to the delivery and installation of a water heater in a bathroom.  The expensive cost of the materials—materials more expensive than the service—does not significantly change the result in this case.  Both the materials and the service were expensive, and the contract FBE performed was predominantly the mixing and installation of the refractory lining.  Therefore, the UCC does not apply to the 2010 and 2012 contracts with FBE.

## C.  UCC Implied Warranties

Minnesota Statute Section 336.2-314, the implied warranty provisions, establishes unless

a contract specifically excludes it, a warranty that goods shall be merchantable is implied in a contract for their sale.  Here, the T&Cs do not disclaim implied warranties.  Thus, if the UCC did apply to the contract, Spectro would have implied warranty claims, notwithstanding their absence from the contract.  Having determined that the UCC does not apply to the work performed by FBE, the implied warranties are not read into the contracts.

**D.  Common Law Implied Warranties**

Spectro concedes there is no common law implied warranty of merchantability.  Thus, Counts 4, 8, and 12, the implied warranty of merchantability claims, are dismissed without further discussion.  But, Spectro argues its common law implied warranties of fitness claims, Counts 3, 7, and 11, survive regardless of UCC applicability.  FBE counters that Minnesota's common law warranty doctrine does not apply to a services contract for the installation of refractory material.  Alternatively, FBE argues that assuming a common law warranty of fitness does exist, Spectro cannot establish all of the requisite elements to pursue such a claim.

In 1966, the Minnesota Supreme Court extended the doctrine of common law implied warranty to construction contracts "under circumstances where (1) the contractor holds himself out, expressly or by implication, as competent to undertake the contract; and the owner (2) has no particular expertise in the kind of work contemplated; (3) furnishes no plans, design, specifications, details, or blueprints; and (4) tacitly or specifically indicates his reliance on the experience and skill of the contractor, after making known to him the specific purposes for which the building is intended."  Robertson Lumber Co. v. Stephen Farmers Coop. Elevator Co., 274 Minn. 17, 24 (1966).  In 1978, the Minnesota Supreme Court declined to extend common law implied warranty claims to "architectural contracts."  Mounds View v. Walijarvi, 263

9

N.W.2d 420, 424 (Minn. 1978).  The Supreme Court, in analyzing the services provided by

doctors, architects, and lawyers, reasoned that, "[b]ecause of the inescapable possibility of error

which inheres in these services, the law has traditionally required, not perfect results, but rather

the exercise of that skill and judgment which can be reasonably expected from similarly situated

professionals."  Id.  Malpractice theories of tort law therefore govern liability claims in relation

to these types of professional services.  The Supreme Court discussed its concern with extending

implied warranties to services:

> The implied warranty of fitness originated primarily as a means of facilitating the
> legitimate interests of the consuming public and bringing common-law remedies into
> step with the practicalities of modern industrialism.  The outmoded requirement of
> contractual privity, coupled with manufacturers' sweeping disclaimers of liability,
> frequently operated to deny effective remedies to those who purchased commercial
> products at the bottom of a multi-tiered production and distribution network.  The
> introduction of the implied warranty doctrine created an effective remedy by
> allowing plaintiffs to proceed directly against the offending party without reliance
> on express contractual warranties.
>
> The relationship between architect and client is markedly different.  For a client,
> architectural services are hardly produced by a faceless business entity, insulated by
> a network of distributors, wholesalers, and retailers.  Architects and clients normally
> enjoy a one-to-one relationship and communicate fairly extensively during the course
> of the relationship.  When a legal dispute arises, the client has no trouble locating the
> source of his problem, and a remedial device like the implied warranty is largely
> unnecessary.

Id. (citing Prosser, Torts (4 ed.) §§ 97, 98).  However, the Supreme Court did not overturn

Robertson, stating in a footnote that general contracting services are different.  Id.

No Minnesota court has since attempted to define construction contracts that are covered

by common law tort principles in contrast to those covered by implied warranties of fitness for

purpose intended under UCC principles.  The discussion has largely shifted and now focuses on

the UCC and the predominant purpose test.  Whether the predominant purpose of a hybrid

contract is for services or goods supplants the question of whether the contract is a general

construction contract or a professional services contract.  Compare Bekkevold v. Potts, 173

Minn. 87 (1927) (the Supreme Court urged the liberal application of the doctrine of implied

warranty) with Valley Farmers' Elevator v. Lindsay Bros. Co., 398 N.W.2d 553, 555 (Minn.

1987).  The last time the Supreme Court cited Bekkevod was in Kopet v. Klein, 275 Minn. 525

(1967), where it stated "warranty applies where the sale involves not only a transfer of a chattel

but also some related service, such as construction."  In 1977, the Supreme Court discussed

Kopet in relation to the UCC, determining the installation of a water heater (a good) was covered

by the implied warranties of the UCC.  O'Laughlin v. Minnesota Natural Gas Co., 253 N.W.2d

826, 830-831 (Minn. 1977).  Finally, the Minnesota Supreme Court has more recently employed

the predominant factor test in deciding if a contract is covered by implied warranties under the

UCC.  Valley Farmers', 398 N.W.2d at 555 (the last case to cite Kopet).  The Court's application

of the predominant factor test and the finding of a "services" contract is dispositive of the

common law claim.  It does not survive in the context of the refractory services contract here at

issue.

        Even assuming common law implied warranties of fitness are still viable claims outside

the predominant purpose analysis, Spectro's claims do not fall within the scope of the doctrine as

defined by the Minnesota cases discussed above.  The Robertson factors and the factors

discussed in Mounds View, do not support that Spectro is entitled to an implied warranty of

fitness.  The undisputed facts are that FBE and Spectro did not sign a contract in which only

FBE had experience with the installation of refractory materials.  Spectro had a ten-year history

with FBE before the 2010 installations and served as general contractor for some of those past

projects.  Therefore, Spectro cannot claim it has no particular expertise in the kind of work

contemplated.  In addition, Spectro expanded Furnace No. 3's capacity, employing third-parties

to design and build the furnace shell.  Spectro did not rely wholly on FBE to construct the

furnaces; rather Spectro considered who to hire for each part of the construction.  Furthermore,

Spectro ultimately chose and approved the raw materials that FBE would use to mix and install

the refractory lining.  Finally, the construction and installation was substantially conducted on

Spectro's premises.  Spectro observed the mixing and installation of the lining. This one-to-one

relationship is what Minnesota courts have found is not well served by implied warranties.  See

Mounds View, 263 N.W.2d at 424.  Thus, Spectro's implied warranty of fitness claims, Counts

3, 7, and 11 are dismissed.

**E.  Express Warranty**

FBE argues that it is entitled to summary judgment on Spectro's breach of express

warranty claim as to Furnace No. 1, Count 10, because the T&Cs require notice of any defects

within six months.  Spectro argues that the UCC applies and the notice period in the express

warranty is unreasonable because it does not consider latent defects that could not be discovered

until the replacement work occurred in 2012.

As discussed above, the UCC does not apply to this contract as the purpose is

predominantly providing services.  But, parties may contract to limit the time frame and manner

in which a party is required to give the other party notice of a warranty claim.  Valspar Refinish,

Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 365 (Minn. 2009).

The T&Cs state, "It will be the responsibility of [Spectro] to notify [FBE] of any defects

in workmanship or materials within six months after completion of the installation or the

material purchase." Furnace No. 1 repair work was performed in 2010. It is undisputed Spectro did not give notice of any defects with the work in Furnace No. 1 until at least December 2012. Since Spectro did not inform FBE of any defects within six months, Spectro's claims arising from FBE's work on Furnace No. 1 are barred as a matter of law.

Spectro's argument about latent defects is not persuasive even if the UCC were found to apply. Spectro argues that under the UCC, a buyer must give notice to a seller within a "reasonable time" or if the parties by agreement set notice obligations, those obligations may not be "manifestly unreasonable." Minn. Stat. § 336.1-302. In this case, FBE worked on-site at Spectro's facility. FBE did not deliver a finished product within which latent defects may have hidden. Instead, Spectro purchased the raw materials and had the opportunity to observe FBE's preparations and installation of the refractory lining. Spectro cannot claim that it was unaware of its obligations. Thus, FBE is entitled to dismissal of Count 10 of Spectro's Amended Complaint.

**F.  Statute of Limitations**

FBE argues claims for work performed on Furnace No. 3 in 2010 are barred by the two-year statute of limitations applying to claims relating to improvements to real property. Spectro argues the statute of limitation does not apply because FBE's work falls under the statute of limitations exception for machinery or equipment. Alternatively, Spectro argues its express warranty claim did not accrue until FBE refused to honor its responsibilities under the warranty. Finally, Spectro argues that the statute of limitations should be tolled in light of FBE's unsuccessful attempts to repair Furnace No. 3.[1]

---

[1] The work on Furnace No. 3 was completed in July 2010. Spectro claims it informed FBE of problems with the refractory lining no later than January 2011. Therefore, taking the facts in the light most favorable to the non-moving party, Spectro's breach of warranty claim is

Pursuant to Minnesota Statute Section 541.051, actions for breach of contract and warranty related to injuries to real or personal property "arising out of the defective and unsafe condition of an improvement to real property" must be brought within two years of discovery of the injury or breach.  Minn. Stat. § 541.051, subd. 1(a).  Section 541.051's statute of limitations applies to claims alleging defective workmanship, Greenbrier Vill. Condo. Two Assoc. v. Keller Inv., Inc., 409 N.W.2d 519 (Minn. Ct. App. 1987), including claims against parties who perform construction of the improvement and "persons who furnish materials used in constructing improvements to real property."  Appletree Square 1 Ltd. P'ship v. W.R. Grace & Co., 815 F.Supp. 1266, 1273 (D. Minn. 1993), aff'd, 29 F.3d 1283 (8th Cir. 1994).  "The limitations prescribed in [Minnesota Statutes Section 541.051, subd. 1] do not apply to the manufacturer or supplier of any equipment or machinery installed upon real property."  Minn. Stat. § 541.051, subd. 1(e).  Courts have explained the distinction between suppliers of equipment and those who make improvements to real property:  (1) suppliers of "ordinary building materials," such as nails, screws, windows, foundations, floors, doors, roofs, joists, ventilations fans, and sprinkler systems are covered by the two-year limit, and  (2) suppliers of large scale items which are not integral to or incorporated into the building and could exist separately from the building structure, and suppliers who can protect themselves through their own warranty provisions, are not entitled to the benefits of the two-year limit.  See, e.g., Integrity Floorcovering, Inc., v. Broan-Nutone, LLC, 521 F.3d 914 (8th Cir. 2007).

Spectro's argument that the refractory lining is not an improvement to real property is not persuasive.  Here, the refractory lining is not an ordinary building material; it is a large scale

---

within the express warranty's six month notice requirement.

item that is integral to and incorporated into the furnace building.  It also could not exist separately from the building structure, as it is specially made for the smelting furnaces. Therefore, FBE's work on the lining was an improvement to real property and is subject to the two year statute of limitations.

But, establishing that the two year statute of limitations applies, does not answer the question of when the statute of limitations begins to run.  Lawsuits based on breach of an express warranty "shall be brought within two years of the discovery of the breach."  Minn. Stat. § 541.051, subd. 4; see also Metro. Life Ins. Co. v. M.A. Mortenson Cos., 545 N.W.2d 394, 401 (Minn. Ct. App. 1996).  Subdivision 4 of Minnesota Statutes Section 541.05 provides that actions based on breach of express warranty run upon discovery of the breach of the express warranty.

Spectro claims it notified FBE of problems with Furnace No. 3 in January 2011, within the express warranty provisions.  In March 2011, FBE conducted repairs on site at Spectro. FBE's work was apparently covered by the express warranty as neither party has cited evidence Spectro paid FBE for these repairs.  Spectro and FBE continued to discuss what could be wrong with the lining, sending samples of the refractory lining for testing to determine what caused its failure.  Spectro claims it was not until December 2012 that FBE affirmatively communicated to Spectro that, "to the extent you are making a warranty claim, it is denied."  Because FBE was attempting to honor the express warranty up until March 2011, Spectro had no reason to assert a warranty claim.  Therefore, since this lawsuit was filed in February 2013, Spectro filed its claim less than two years after the earliest possible breach, in March 2011.  Thus, FBE is not entitled to summary judgment based on the statute of limitations.

**G.  Breach of Purchase Orders**

FBE contends Spectro's warranty claims and breach of purchase order claims are duplicative.  Spectro argues its breach of purchase order claims are pled in the alternative.

Spectro's breach of purchase order claims mirror its breach of warranty claims.  In Counts 1, 5, and 9 of Spectro's Amended Complaint, Spectro alleges FBE's work does not conform to contract specifications, namely, FBE failed to build and repair the furnaces as promised under the warranty.  This is precisely what Spectro claims in Counts 2, 6, and 10.  There are cases in which a party may plead separate breach of contract and breach of warranty claims.  See, e.g., Alcan Aluminum Corp. v. BASF Corp., No. 3:97-CV-1480-L, 2001 U.S. Dist. LEXIS 16807, *13-20 (N.D. Tex. 2001) ("delivery of inferior goods or services equate to a warranty claim while delivery of nothing equates to a contract claim" and plaintiff "failed to establish that a genuine issue of material fact exists with respect to whether its breach of contract claim is distinct from its breach of warranty claims"); see also Reynolds Metals Co. v. Westinghouse Electric Corp., 758 F.2d 1073 (5th Cir. 1985) (discussed at length in Alcan) (holding that a warranty claim survived alongside a contract claim where a service was promised in addition to the sale of a good); and see Rhode v. E & T Invs., Inc., 29 F. Supp. 2d 1298, 1302 (M.D. Ala. 1998) (plaintiff did not allege defendant failed to deliver on the contract, "such an allegation would clearly suffice to establish a breach of contract claim; [rather], the plaintiff alleges the manufacturer has delivered a defective product" under warranty; therefore, "based on plaintiff's assertion that the warranty is the contract breached in this case, the court finds that plaintiff's breach of contract claim is due to be dismissed.").  In this case, the Amended Complaint states, "FBE breached its contractual obligations to Spectro by wrongfully asserting

that Spectro is responsible for the cost of replacing the refractory of Furnace No. 3 in 2010 [and in 2012]", Am. Compl. ¶¶ 18, 35, and "FBE has breached its contractual obligations to Spectro by failing to repair Furnace No. 1." Id. ¶ 52. These "obligations" are warranty obligations as reflected in the warranty claims, not separate contractual obligations. The purchase order claims are therefore dismissed.

**H. Exclusive Remedy and Consequential Damages**

FBE seeks summary judgment on the grounds that Spectro cannot recover any damages. FBE argues that Spectro has no recoverable damages under the T&Cs because (1) the exclusive remedy for deficiencies in the work done on the refractory linings is repair or replacement, and (2) the recovery of consequential damages is excluded.

First, the plain language of the T&Cs do not make repair or replacement by FBE the exclusive remedy for deficiencies found in the refractory lining. In the T&Cs, FBE offered to provide material and labor to correct any deficiency with its work, but there is no exclusive language limiting Spectro's options for correcting a deficiency.[2] Spectro argues convincingly that the contracts allowed Spectro to hire a third party to make repairs. But certainly, when FBE

---

[2] In a deposition, FBE asked Terry Robinson, Spectro's Maintenance Manager who signed all of FBE's proposals, about his understanding of the T&C. FBE argues it clarified that Spectro viewed repair or replacement work done by FBE as the only remedy. The deposition does not conclusively demonstrate exclusivity:

Q:   So you understood, to the extent that there was any defective workmanship on the part of Fire Brick, it would essentially provide materials or labor, and that was what Spectro would get in return if there was a problem, right?
A:   From what I understand, that they were to provide it and correct any problems.
Q:   That was the remedy, correct?
A:   Correct.

Windler Decl. Ex. C. 108:11-25. As in the T&C itself, there is no mention of FBE providing the exclusive repair or replacement work. Furthermore, there is no mention of remedies should FBE refuse to perform covered warranty work.

refused to make repairs under the warranty the situation had changed.  See Laudon Decl. Ex. 30.

FBE counters that repair and replacement costs by third parties are "refunds" and thus are not direct damages, but are rather consequential damages.  Mem. Supp. Summ. J. [Docket No. 61] 26-27 (citing, Transport Corp. of America, Inc. v. International Bus. Machines Corp. Inc., 30 F.3d 953, 960 (8th Cir. 1994) (affirming grant of summary judgment with respect to properly disclaimed consequential damages); Nelson Distrib., Inc. v. Stewart-Warner Indus. Balancers, 808 F.Supp. 684, 688-689 (D.Minn. 1992) (same); Am. Computer Trust Leasing v. Jack Farrell Implement Co., 763 F.Supp. 1473, 1488-1489 (D.Minn. 1991), aff'd, 967 F.2d 1208 (8th Cir. 1992) (same).

These cases are inapposite.  Regardless of whether a properly drafted consequential damages clause can disclaim or exclude third-party replacement work as "refunds," in this case, the T&Cs do not do so.  FBE guaranteed that "all work will be done in a competent manner and will be free from defects;" therefore, any repair or replacement work stemming from failures in workmanship are direct damages.  This necessarily includes repair and replacement costs, as this remedy is what FBE directly offered to cover.  If proven at trial, repair or replacement costs are direct damages under the warranty.  See Nelson Distrib., 808 F. Supp. at 688-689 (direct damages are "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted").

In addition to the repair and replacement costs it incurred, Spectro seeks damages for the production it lost due to the alleged premature failure of the refractory linings.  FBE argues that these consequential damages are excluded by the T&Cs.  Spectro responds that the T&Cs were form contracts that do not clearly exclude consequential damages such as lost profits.  Further,

consequential damage exclusions are not favored by the courts and are, thus, strictly construed

against the manufacturer or seller.  Spectro, for these reasons, asserts claims for lost profit

damages should be allowed.  Interestingly, Spectro and FBE have exchanged stances from their

warranty arguments on the applicability of a UCC standard.  Spectro is now arguing for a

common law standard.  FBE is now advocating for application of a UCC standard.

How consequential damages should be considered in hybrid contract cases determined to

be for the predominant purpose of services, has not been answered.  Under Minnesota common

law, contractual provisions limiting liability are generally disfavored.  Am. Litho, Inc. v. Imation

Corp., No. 08-5892, 2010 U.S. Dist. LEXIS 15712, *13 (D. Minn. 2010).  But, lost profits are

consequential damages that are generally recoverable for breach of warranty under the UCC.

See Industrial Graphics, Inc. v. Asahi Corp., 485 F. Supp. 793, 803 (D. Minn. 1980).  In 1990,

the Minnesota Supreme Court described how it views the difference between the UCC and the

common law when it comes to assessing damage claims.  Hapka v. Paquin Farms, 458 N.W.2d

683, 688 (Minn. 1990).  On the one hand, the Minnesota Supreme Court sees the UCC as "less

than adequate in the ordinary consumer transaction," explaining:

> Generally speaking, a consumer has neither the skill nor the bargaining power to
> negotiate either warranties or remedies. If a defective coffee pot causes a fire which
> destroys a consumer's home, the panoply of liability theory should be available to
> the consumer -- strict products liability and negligence as well as breach of warranty
> -- whether or not personal injuries accompany the property damage.

Id.  On the other hand, "the law is entitled to expect the parties to commercial transactions to be

knowledgeable and of relatively equal bargaining power so that warranties can be negotiated to

the parties' mutual advantage."  Id.

Spectro and FBE signed the T&Cs as sophisticated commercial entities engaged in arms-

length transactions.  Neither has argued that the other is in an unequal bargaining position.

Therefore, the consequential damage claims should be analyzed through the lens of the UCC.

Under the UCC, "consequential damages may be limited or excluded unless the limitation or

exclusion is unconscionable."  Id.  The T&Cs list damages that are "not included in the

warranty."  The T&Cs exclude damages stemming from normal wear and tear, damages resulting

from explosions or abnormal service conditions, and damages caused by failure of materials not

manufactured by FBE.  At the end of the list of repairs not covered by the warranty, the T&Cs

declare "OR ANY OTHER CONSEQUENTIAL DAMAGES."  Thus, the parties clearly agreed

Spectro would not make claims for needed repairs due to the listed causes or for any other

consequential damages.  Consequential damages, such as lost profits, are therefore excluded by

the T&Cs and FBE is entitled to summary judgment on the issue as a matter of law.

## I.  FBE's Equitable Counterclaims

FBE has asserted counterclaims against Spectro.  Spectro moves to dismiss FBE's

equitable claims: unjust enrichment (Count 2), promissory estoppel (Count 3), and quatum

meruit (Count 6).  FBE argues that these claims are necessary as alternative theories of liability

to its breach of contract claim (Count 1) for unpaid work on Furnace No. 3 in 2012.

Pursuant to the Federal Rules of Civil Procedure, FBE is entitled to plead alternative

theories of relief.  Fed. R. Civ. P. 8(d)(2)-(3).  Where a plaintiff's primary contract claim may

fail to provide a legal remedy, equitable claims may be appropriate.  Daigle v. Ford Motor Co.,

713 F. Supp. 2d 822, 828 (D. Minn. 2010).  Thus, a party may simultaneously pursue equitable

remedies despite the fact that it is barred from ultimately recovering at both law and equity.  See,

e.g., George v. Uponor Corp., 988 F. Supp. 2d 1056, 1075 (D. Minn. 2013) (permitting plaintiff

20

to pursue unjust enrichment theory even though recovery on that theory may later be precluded);

In re Levaquin Prods. Liab. Litig., 752 F. Supp. 2d 1071, 1081 (D. Minn. 2010) (same).  In

particular, federal courts "routinely permit the assertion of contract and quasi-contract claims

together" as alternative pleadings.  Cummins Law Office, P.A. v. Norman Graphic Printing Co.,

826 F. Supp. 2d 1127, 1130 (D. Minn. 2011).  Parties are entitled to assert equitable claims as

alternative theories for recovery until such time as the finder of fact determinatively concludes

that a valid and enforceable contract exists between the parties which governs the specific

dispute before the court.  See, e.g., P.I.M.L., Inc. v. Fashion Links, LLC, 428 F.Supp.2d 961, 973

(D. Minn. 2006).

Spectro claims it does not contest the validity of the 2012 contract for Furnace No. 3.

However, Spectro claims repairs for deficiencies in the 2010 contract work for Furnace No. 3

should be covered under the warranties.  Spectro has not explained how the 2012 contract would

survive a jury's finding that (1) FBE breached the 2010 contract and (2) all work in 2012 should

be warranty work under the 2010 contract.  Therefore, since Spectro's only argument for

dismissing FBE's equitable claims is the "uncontested" nature of the 2012 contract, FBE's

equitable claims will not be dismissed at this time.

**J.  Motions to Exclude Experts**

FBE moves to exclude part or all of the testimony of four of Spectro's expert witnesses.

Spectro moves to exclude portions of anticipated testimony of one of FBE's experts.  Rule 702

of the Federal Rules of Evidence governs the admissibility of expert testimony.  The rule states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 reflects but does not codify the holding of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), or the cases interpreting Daubert, including Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999).  Fed. R. Evid. 702 advisory committee's note.

In addition to Rule 702, trial courts may consider several factors set out by Daubert for determining reliability, including: (1) whether the theory can be (and has been) tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory enjoys general acceptance in the relevant scientific community.  Daubert, 509 U.S. at 593-94.  Courts have also considered whether "the expertise was developed for litigation or naturally flowed from the expert's research."  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 687 (8th Cir. 2001).  No single Daubert or Rule 702 factor is determinative.  Instead, the trial court must evaluate reliability in a flexible manner, as the Daubert factors may not necessarily apply "to all experts or in every case."  Kumho, 526 U.S. at 141.  Thus, the trial court has broad discretion not only in ultimately determining reliability, but also in how it determines reliability of an expert.  Id. at 142.

Rule 702 "reflects an attempt to liberalize the rules governing the admission of expert testimony."  Lauzon, 270 F.3d at 686.  The trial court should generally resolve doubts about the

22

usefulness of an expert's testimony in favor of admissibility. <u>Marmo v. Tyson Fresh Meats, Inc.</u>, 457 F.3d 748, 758 (8th Cir. 2006). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>Bonner v. ISP Techs., Inc.</u>, 259 F.3d 924, 929-30 (8th Cir. 2001).

In addition, the preferred way to challenge an expert is "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion of the expert. <u>Daubert</u>, 509 U.S. at 596.

### 1. Brian Cochran

Brian Cochran is one of Spectro's proffered experts on secondary aluminum smelting operations. Cochran's education includes his degree in chemistry, with a minor in engineering. Thomas Boyd Decl. [Docket No. 96] Ex. B. Cochran worked for Wabash Alloys Corporation, one of the largest producers of secondary aluminum alloys, from 1975 through 2005. For the last twenty years of this employment, Cochran served as Director of Technical Services. In this role, Cochran developed and implemented "Best Operating Practices" for Wabash's secondary aluminum smelting furnaces in all of its plants. Since 2006, Cochran has served as a "best practices" consultant to 15 secondary aluminum casting alloy manufacturers operating more than 25 reverbatory furnaces.

Spectro claims Cochran's extensive experience and review of Spectro's operations—past and present—entitle him to opine as an expert on Spectro's operating procedures in relationship to industry norms, including industry norms regarding operating temperatures, chlorine usage, and flux usage. Spectro proffers Cochran will testify how Spectro's manufacturing processes impacted the refractory lining. FBE argues that Cochran's background and experience has

focused on quality control issues relating to the product that is ultimately generated and sold to end users, not the operational practices that affect the refractory linings of the furnaces. Boyd Decl. Ex. G ("Cochran Dep.") 34:19-38:21. Furthermore, Cochran acknowledges that he has little experience or expertise in furnace design, construction, repair, or maintenance and no experience with the manufacture, design, installation, performance, repair, maintenance, or failure of refractory material. Cochran Dep. 146:14-153:15.

Based on the parties representations and Cochran's deposition testimony, his opinion about industry norms and "best practices" for achieving optimal resulting aluminum product are admissible, if relevant, at trial. Cochran is also competent to testify how Spectro's operating procedures, to the extent he has reviewed them, compare to industry norms. However, because Cochran claims no knowledge of refractory composition, or about how operating procedures interact with and affect refractory lining, Cochran will not be permitted to opine on issues such as how long a refractory lining lasts, or why Spectro's refractory linings failed in these cases.

### 2. Don Woessner

Spectro will offer Don Woessner as an expert on lost profits and for lay opinion concerning out-of-pocket expenses Spectro paid to repair or replace Furnace Nos. 1 and 3. FBE argues that Woessner is not an expert on lost profits and has made numerous errors in his analysis of lost profits. Furthermore, FBE argues that Woessner's opinion is not needed for the calculation of out-of-pocket expenses.

As an initial matter, lost profits, as explained above, are consequential damages which are excluded under the contracts at issue here. Therefore, Woessner's expertise in analyzing these losses need not be examined as testimony about lost profits will not be received at trial.

As to out-of-pocket expenses, Woessner's simple calculation of repair and replacement costs is not necessary.  Woessner has served as Spectro's Chief Financial Officer for the last thirteen years and is a former Certified Public Accountant, but he does not appear to have first-hand knowledge of the repair and replacement costs, which he calculated from documents given him by another of Spectro's listed witnesses, Terry Robinson.  Both parties agree that the attorneys are qualified to add the series of numbers that represent out-of-pocket expenses and there are other witnesses with greater personal knowledge about what those expenses were.  Thus, Woessner's expected testimony will not assist the jury.  Therefore, Woessner's testimony as to damages is excluded.

### 3. Ruth Engel

Ruth Engel, who will be called by Spectro as an expert, has worked in the refractory industry for over 30 years, both designing and supervising the installation of refractory in industrial furnace applications and forensically analyzing refractory failures.  See Boyd Decl. Ex. I, at 158-59.  FBE does not object to Engel's qualifications.  See Def.'s Mem. Supp. to Exclude Ruth Engel [Docket No. 94] 1-3.  Rather, FBE takes issue with how Engel analyzed the possible causes of the alleged premature failure of the refractory linings in this case.  FBE relies on  its own expert for testimony about what Engel should have considered.   FBE also argues an article published by Engel contradicts her own conclusions in this case.  Spectro disagrees.

FBE's objections to Engel's expert report are the type of challenge which is best left for cross-examination before the jury.  FBE has not shown Engel's opinion is "so fundamentally unsupported that it can offer no assistance to the jury."  See Bonner, 259 F.3d at 929-30.  Therefore, Engel's testimony will not be excluded at this time.

### 4. James Wunch

Spectro's fourth expert witness is James Wunch.  As with Engel, FBE does not object to

Wunch's experience, which consists of 39 years in the industry where he has developed,

designed, manufactured, sold, and installed refractory, most of it for furnaces in the metals

industry.  Joseph M. Windler Decl. [Docket No. 115] Ex. A 22.  Instead, FBE objects to

Wunch's conclusions.  As with the other experts discussed above, FBE has not shown that

Wunch's opinions are fundamentally unsupported.  FBE's concerns about Wunch's conclusions

can be subjected to cross-examination at trial, including impeachment with deposition testimony

that FBE claims contradicts Wunch's expert reports.  Therefore, James Wunch's expert opinions

will not be excluded at this time.

### 5. Tom Meeks

Tom Meeks is the FBE expert whose testimony at trial is challenged by Spectro.  Spectro

characterizes Tom Meeks as a mechanical engineer with no experience manufacturing or

installing refractory, and with only minor experience conducting refractory failure analysis.  Pl.'s

Mem. Supp. to Exclude Portions of the Anticipated Testimony of Tom Meeks [Docket No. 99] 1.

FBE disagrees, pointing to Meeks' 40 years working in the aluminum smelting industries,

including work in furnace design and construction.  Daniel J. Schwartz Decl. [Docket No. 98]

Ex. 1.  FBE also argues that Meeks has extensive knowledge and experience regarding the

performance of refractories that have been installed in the furnaces that he has operated.

Consequently, FBE argues, he is qualified to offer opinions regarding the effects that operation

of a furnace will have on refractory installed in that furnace.

As with Engel and the rest of the parties' expert witnesses, the Court will not exclude

portions of Meeks' anticipated testimony at this time.  Spectro has not shown that Meeks' opinion is fundamentally unsupported, nor has it demonstrated that it will offer no assistance to the jury.  Spectro's concerns about Meeks' testimony can be tested through proper cross-examination and objections during trial.

## IV.  CONCLUSION

Based on the foregoing, and upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Fire Brick Engineers Co., Inc.'s Motion for Summary Judgment [Docket No. 59] is **GRANTED in part, and DENIED in part** as follows:

    a. Counts 1, 3-5, and 7-12 are **DISMISSED**.

    b. Counts 2 and 6 **REMAIN**.

    c. Lost profit damages are excluded as consequential damages.

2. Plaintiff Spectro Alloys Corporation's Motion for Summary Judgment as to Counterclaim Counts 2-3, and 6 [Docket No. 76] is **DENIED**.

3. Defendant Fire Brick Engineers Co., Inc.'s Motion in Limine to Exclude Expert Testimony by Brian Cochran [Docket No. 82] is **DENIED**.

4. Defendant Fire Brick Engineers Co., Inc.'s Motion in Limine to Exclude Expert and Lay Opinion Testimony by Don Woessner [Docket No. 86] is **GRANTED**.

5. Defendant Fire Brick Engineers Co., Inc.'s Motion in Limine to Exclude Expert Testimony by Ruth Engel [Docket No. 91] is **DENIED**.

6. Defendant Fire Brick Engineers Co., Inc.'s Motion in Limine to Limit James Wunch's Testimony [Docket No. 112] is **DENIED**.

7.      Plaintiff Spectro Alloys Corporation's Motion to Exclude Expert Testimony of

Tom E. Meeks [Docket No. 92] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 3, 2014.

28